IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Chastity Shovonne Evege,<br><br>Plaintiff,<br><br>vs.<br><br>Commissioner of Social Security,<br><br>Defendant. | CASE NO. 1:23-cv-0780<br><br>DISTRICT JUDGE<br>Benita Y. Pearson<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Chastity Shovonne Evege filed a Complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

**Procedural background**

*1. Previous application*

In August 2018, Evege filed applications for disability insurance benefits and supplemental social security income, alleging a disability onset

date of October 13, 2017.[1] Tr. 69. Administrative Law Judge (ALJ) Noceeba

Southern issued a written decision in September 2020, finding that Evege was

not disabled. Tr. 83. ALJ Southern found that Evege retained the residual

functional capacity (RFC)[2] to:

> perform light work as defined in 20 CFR 404.1567(b)
> and 416.967(b) except that the claimant can tolerate
> frequent foot controls with the left lower extremity,
> occasional ramps or stairs but should avoid ladders,
> ropes, or scaffolds. She can occasionally stoop, kneel,
> crouch, and crawl. She should avoid hazards,
> including moving machinery, heavy machinery, and
> unprotected heights. She can perform simple,
> routine tasks with no fast-paced work or strict
> production quotas. She can tolerate occasional but
> superficial interaction with coworkers, supervisors,
> and the public, superficial being that which is
> beyond the performance of job duties and job
> functions, for a specific purpose, and a short
> duration.

Tr. 74. ALJ Southern's disability decision concerned the time period from

October 13, 2017, to September 24, 2020. *See* Tr. 83.

   *2. Present application*

   In early December 2020, Evege filed the application for disability

---

[1]     "Once a finding of disability is made, the ALJ must determine the onset
date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422,
425 (6th Cir. 2006).

[2]     An RFC is an "assessment of" a claimant's ability to work, taking his or
his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235,
239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social
Security Administration's "description of what the claimant 'can and cannot
do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting
*Howard*, 276 F.3d at 239).

insurance benefits and supplemental social security income at issue in this case. Tr. 27, 88, 208, 215. She claimed that she was disabled due to back problems, depression, anxiety, and high blood pressure.[3] Tr. 88, 247. She initially alleged a disability onset date of October 13, 2017, but later amended the date to December 9, 2020. Tr. 208, 215; *see also* Tr. 39–40, 54, 56. The Commissioner denied Evege's applications at the initial level and on reconsideration. Tr. 88–116. Evege requested a hearing before an ALJ. Tr. 156–58. In January 2022, ALJ Jeffrey Hartranft held a hearing at which Evege and vocational expert Lanell Hall testified. Tr. 33–65. Six days later, ALJ Hartranft issued a written decision finding that Evege was not disabled. Tr. 12–32. Evege appealed. Tr. 206. ALJ Hartranft's decision became final in February 2023, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Evege filed this action in April 2023. Doc. 1. In it, Evege asserts the following assignments of error:

> 1. Whether the ALJ failed to identify substantial evidence supporting the residual functional capacity finding, and whether the ALJ failed to properly develop the record when finding there to be new and material evidence significant enough to depart from the prior ALJ's findings.

Doc. 8, at 1.

---

[3]     In her brief, Evege lists her impairments as lumbar spine degenerative disc disease, status post open reduction internal fixation surgery of the left tibia and fibula, reversible cerebral vasoconstrictive syndrome, depression, anxiety, migraines, asthma, and obesity. Doc. 8, at 2. The Commissioner does not dispute these allegations.

**Factual background**

*1. Personal and vocational evidence*

Evege was born in 1976 and was 44 years old on her amended alleged disability onset date.[4] Tr. 39–40, 88. She attended some high school. Tr. 248. She previously worked as a driver, a home health aide, and a nurse's assistant at a nursing home. Tr. 60, 248.

*2. Medical evidence*[5]

*Physical impairment evidence.* Before the relevant time period, Evege was diagnosed with degenerative disc disease in her lumbar spine at L4–L5 and L5–S1.[6] Tr. 395–96. Evege attended a cannabis consultation appointment with Sarah E. Blake, M.D., during which she reported chronic lumbar back pain which radiated down her legs and was worse on her right side. Tr. 389.

---

[4]    Although the ALJ says that Evege was 41 years of age on the alleged disability onset date, Tr. 26, she was 44 years old on December 9, 2020, *see* Tr. 39–40, 88.

[5]    This recitation of medical evidence is not intended to be exhaustive. The discussion of the evidence is limited to the evidence cited by the parties in their briefs and any additional evidence necessary to provide context.

[6]    Vertebrae in a person's spine are given letter and number designations according to their location. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

Evege rated her pain at a "10" out of ten. *Id*. She said that previous attempts to relieve her pain with steroid injections, physical therapy, and medication had been unsuccessful. *Id*. Dr. Blake found Evege an appropriate candidate for medical marijuana. Tr. 390. Evege continued to manage her pain by smoking marijuana throughout the relevant time period. *See, e.g.*, Tr. 416, 789, 831, 855, 982, 1080, 1113, 1132, 1147 (treatment notes recording marijuana use).

In December 2020, a few days before the amended alleged disability onset date, Evege sought emergency medical treatment for a migraine causing nausea, extreme sensitivity to light, and difficulty ambulating. Tr. 414–19, 436, 580–605. A computed tomography scan of Evege's brain showed "negative results." *See* Tr. 420. Evege's treating physician, Levi K. Harper, M.D., was not able to complete an examination "due to [Evege] not participating in the exam." Tr. 417–18. Dr. Harper noted that Evege "appear[ed] … competent enough to make healthcare decisions" and so he informed her that she was "welcome to sign her[self out] … and obtain healthcare elsewhere." *See id*. Evege left. *Id*.

Evege returned two days later seeking treatment for incontinence and left leg weakness. Tr. 420, 436. She again reported a headache, which had lasted for several days. *Id*. Evege was admitted to the hospital and eventually diagnosed with reversible cerebral vasoconstrictive syndrome.[7] Tr. 442, 485.

---

[7]     Reversible cerebral vasoconstriction syndrome is a reversible group of disorders "characterized by severe headaches and a narrowing of the blood vessels in the brain" from which patients often recover within three months. *Reversible Cerebral Vasoconstriction Syndrome*, Cedars Sinai Health Library, https://www.cedars-sinai.org/health-library/diseases-and-

There are indications in the record that Evege may also have had a stroke at this time.[8] *See* Tr. 450, 794, 868, 887, 980; *see also* Tr. 101–02, 108, 119. Treating physician Adnan Safdar, M.D., found decreased sensation in Evege's lower extremities, specifically her left foot. Tr. 441. Dr. Safdar observed that Evege's left leg was weaker than her right and that she lacked reflexes in her left plantar and Achilles tendons, though her patellar tendon reflexes were intact. Tr. 423, 441, 485. He requested a consult from the neurology department and Casey Potts, D.O., responded. Tr. 436–49.

Dr. Potts consulted with Dr. Safdar during Evege's hospital stay. Dr. Potts reviewed brain MRI results and found "small foci of diffusion restriction."[9] Tr. 436, 441–42. In Evege's lumbar spine, Dr. Potts observed

---

conditions/r/reversible-cerebral-vasoconstriction-syndrome-rcvs.html [https://perma.cc/7XJZ-VKGE].

[8]     The record is unclear as to whether Evege actually had a stroke in December 2020. There are references that seem to indicate she did, however, there are also references that seem to indicate she did not. *See, e.g.*, Tr. 984 (treatment notes from July 2021 recording that once Evege was able to "relate more of the history of presumed stroke[,] [i]t sound[ed] as [if] it was a vasospasm[ with] no hemorrhage or clot noted at that time."); *see also* Tr. 794, 1013. It is undisputed, however, that Evege was diagnosed with reversible cerebral vasoconstriction syndrome and thus had a heightened risk of stroke. *See Reversible Cerebral Vasoconstriction Syndrome*, Cedars Sinai Health Library, *supra*, note 7.

[9]     It's not clear what Dr. Potts meant by "restricted diffusion." Restricted diffusion is the restricted movement of water molecules within body tissue, which indicates abnormal density. *See Diffusion Weighted Imaging*, ScienceDirect, https://www.sciencedirect.com/topics/nursing-and-health-professions/diffusion-weighted-imaging [https://perma.cc/3XP3-V42G].

"multilevel degenerative changes of the spine with stable disc herniations with spinal canal stenosis which is moderate to severe at the L4–L5 level and severe at the L5–S1 level."[10] Tr. 436. Dr. Potts reviewed computed tomography images of Evege's brain and found "multifocal bilateral middle cerebral and arterial cerebral branch constrictions."[11] *See* Tr. 550.

Speech and language pathologist Laura Goodrich assessed Evege's speech, language, and cognition during Evege's hospital admission.[12] Tr. 466–70. Goodrich found that Evege had intact skills in reading, social interaction, expressive language, and receptive language. Tr. 468. She could write her biological information with "100%" accuracy. *Id.* Evege's cognitive abilities remained intact across the board, in that Goodrich found normal abilities in orientation, alertness, attention, initiation, problem solving, reasoning, awareness and insight, immediate recall, short term recall, and sequencing.

---

[10]    Spinal canal stenosis happens when the space around the spinal canal becomes too narrow, irritating the spinal cord or the nerves that branch from it. *Spinal Stenosis*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis [https://perma.cc/NT9S-SZL3].

[11]    Cerebral branch constriction is the "narrowing of blood vessels in the brain," which implicates reversible cerebral vasoconstriction syndrome. *See Reversible Cerebral Vasoconstriction Syndrome*, Cedars Sinai Health Library, *supra*, note 7.

[12]    Evege says that Goodrich evaluated her on December 20, 2020, which would have been one week after Evege was discharged. *See* Doc. 8, at 4; Tr. 485 (stating that Dr. Safdar discharged Evege on December 13, 2020). The medical records indicate, however, that Goodrich conducted an evaluation of Evege during Evege's hospital stay on December 10, 2020. Tr. 466.

Tr. 468–69. Goodrich noted that Evege had "mild difficulty with structured attention tasks [but] appropriate attention during nonstructured tasks [or] conversation." Tr. 468. Goodrich recorded one error following a three-minute delay, however, she noted that short-term recall improved "with functional information (i.e. recalling hospital course of stay, work up, etc.)." Tr. 469.

Physical therapist Samuel Maag provided Evege with acute physical and occupational therapy during her hospitalization. *See* Tr. 449–64. Maag found that Evege had intact judgment and was alert, well-oriented, and cooperative. Tr. 451–52. Maag noted that Evege complained of a headache. Tr. 451. He found that Evege's extremities remained capable of bearing full weight. Tr. 450. Evege had a normal range of motion in her lower extremities. Tr. 452–53. She could sit and stand without restriction. Tr. 452. Evege's gait was capable of bearing full weight, though she had a decreased gait speed. Tr. 452–53. Maag found that before her stroke, Evege's basic functional mobility had been "0.00%" impaired. Tr. 454–55. After, her impaired basic functional mobility was "20.91%" impaired. *Id*. Maag indicated that he expected Evege's functional impairment to return to "0.00%." *See id*. He observed that Evege needed "a little assistance" walking in her hospital room and climbing three to five steps with a railing. *Id*. Maag recommended weekly physical therapy to work on "endurance [and] gait training." *See* Tr. 449, 454.

Four days after Evege was admitted, Dr. Safdar authorized her discharge and prescribed Verapamil to prevent future stroke activity. *See* Tr.

485. Dr. Safdar suggested that Evege discontinue Lexapro and Buspar and said that although Cymbalta helped with her pain, she should stop taking it if she experienced another stroke. *See id*.

Four months later, in April 2021, Evege had a neurovascular follow-up with Andrew Slivka, Jr., M.D. Tr. 550. Evege reported that she still had a headache but that it had improved. *Id*. Her left leg had only slight residual weakness. *Id*. Evege reported experiencing weight changes, double vision, tinnitus, loss of bladder control, tender muscles, depression, and chronic back pain. *Id*. She told Dr. Slivka that she had "resumed all prior activities just slower." *Id*. Except for a mild ambulatory limp on her left side, Evege had an otherwise normal neurological examination including normal sensation and full motor strength in her extremities. *Id*.

In mid-April, Evege sought emergency medical treatment for abdominal pain, vomiting, diarrhea, and pain with ambulation. Tr. 787–828. She was diagnosed with uterine fibroids. *See* Tr. 825. Evege's doctor suggested that daily marijuana usage could be causing Evege's "intractable" nausea and vomiting. Tr. 797.

Ten days later, Evege had an appointment with certified nurse practitioner Becky Lea Jensen, a primary care provider specializing in women's health. *See* Tr. 1144–52. Jensen noted that Evege had abdominal bloating and worsening uterine fibroids. Tr. 1146. She found that Evege was "[p]ositive for fatigue" and had a distended abdomen. Tr. 1148. Evege reported

symptoms including nausea, vomiting, and back pain. Tr. 1148–49. Evege had a hysterectomy several months later in July 2021. Tr. 896–1071.

In September 2021, Evege sought emergency medical treatment for pain in her left knee. Tr. 1112. Evege said that she woke up with knee pain and that it had continued "all day long." *Id.* Certified physician's assistant Sara Louise Hall found that Evege did not appear to be in acute distress. Tr. 1115. Hall observed no swelling, tenderness, deformity, or signs of injury. *Id.* Evege's range of motion, coordination, motor strength, muscle tone, and sensation were normal. *Id.* Although Evege had pain with palpitation of the anterior aspect of the left knee, she had a "good range of motion" in her knee and no pain in her calf or the posterior aspect of her knee.[13] Tr. 1115. Hall assessed Evege with tendonitis. Tr. 1116. She wrapped Evege's left knee, prescribed crutches, and suggested that Evege follow up with an orthopedist. *Id.*

A few weeks later, Evege had an appointment with Jensen. Tr. 1129–43. Evege reported new symptoms including hot flashes, fatigue, and irritability, which she attributed to menopause. Tr. 1131. Evege also reported chronic symptoms including a burning, shooting, stabbing, and aching pain in her lumbar spine which radiated into her thighs and caused leg pain, numbness, tingling, and weakness. *Id.* She reported "stiffness … all day." *Id.*

---

[13]  Anterior describes something "situated in front of or in the front part of" a body part while posterior describes something "situated in back of or in the back part of" a body part. *See* Dorland's Illustrated Medical Dictionary 96, 1479 (33rd ed. 2020).

Evege classified her pain as severe, indicating that it had lasted more than a year and remained "the same all the time." *Id*. Bending, lying down, standing, twisting, and stress aggravated Evege's pain. *Id*. Evege indicated that previous attempts to relieve her pain with non-steroidal anti-inflammatory medications, heat therapy, home exercises, and analgesics had been unsuccessful. *Id*. Jensen found that Evege had a decreased range of motion, spasms, tenderness, and bony tenderness in her lumbar back. Tr. 1135. She assessed Evege with chronic low back pain with sciatica, prescribed Duloxetine and Gabapentin, and referred her to a neurosurgeon for further evaluation and treatment. *See* Tr. 1136.

*Mental impairment evidence.* Evege did not see a mental health provider during the relevant time period and treatment providers generally mental status and psychiatric health normal. *See, e.g.*, Tr. 975, 1115 (July and September 2021 findings that Evege was alert and oriented to person, place, and time with normal and cooperative behavior and normal thought content and judgment); Tr. 1135, 1149–50 (April and September 2021 findings of normal attention, mood, speech, behavior, thought content, cognition, and judgment).

3.  *State agency and other medical opinion evidence*[14]

In January 2021, state agency physician W. Scot Bolz, M.D., reviewed the medical evidence. Tr. 88–100. Dr. Bolz indicated that as his RFC in Evege's present application, he was adopting the September 2020 findings of the prior ALJ in compliance with *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), *Dennard v. Sec'y of Health and Hum. Servs.*, 907 F.2d 598 (6th Cir.1990), Acquiescence Ruling 98-3(6), 1998 WL 274051 (Soc. Sec. Admin., June 1, 1998), and Acquiescence Ruling 98-4(6), 1998 WL 274052 (Soc. Sec. Admin., June 1, 1998). *See* Tr. 91–92.

In May 2021, during reconsideration, state agency physician Leon Hughes, M.D., reviewed an updated medical record, including treatment notes from Evege's December 2020 stroke and hospitalization.[15] Tr. 101–16. Dr. Hughes found that the prior ALJ's RFC findings did not apply to Evege's present application due to "new and material changes," namely, Evege's stroke

---

[14]  When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[15]  The treatment notes from Evege's December 9, 2020 hospitalization were not printed until March 2021, s*ee, e.g.*, Tr. 429, and were not included in the evidence that Dr. Bolz reviewed during the initial consideration period, s*ee also* Tr. 89 (listing the evidence received by the date of Dr. Bolz's medical opinion).

in December 2020, which had occurred three months after the previous ALJ issued her decision. *See* Tr. 105. Dr. Hughes noted that Evege had "changed" and "[n]ew" conditions, citing her December 2020 "stroke [and] diagnos[is] with Reversible Cerebral Vasoconstriction Syndrome." Tr. 101.

Dr. Hughes found that Evege had the RFC to perform sedentary work with additional restrictions. Tr. 106. She could lift or carry 20 pounds occasionally and ten pounds frequently. Tr. 104. During an eight-hour workday, Evege could stand or walk for a total of four hours and sit for about six hours. Tr. 104. She could occasionally climb ladders, ropes, and scaffolds and frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Tr. 104–05. According to Dr. Hughes, Evege  had no additional manipulative, visual, communicative, or environmental limitations. Tr. 105.

In January 2021, state agency consultative psychologist Cynthia Waggoner, Psy.D., reviewed the medical evidence during the initial review period. Tr. 101–16. Dr. Waggoner recited the prior ALJ's mental function findings, which found that Evege had no more than mild limitations in the ability to understand, remember, or apply information and adapt or manage herself, and no more than moderately limited in the ability to interact with others and concentrate, persist, or maintain pace. Tr. 90; *see* Tr. 83. Dr. Waggoner stated that these mental RFC findings were an adoption of the prior ALJ's September 2020 findings in compliance with Acquiescence Ruling 98-4 and *Drummond.* Tr. 90.

In April 2021, state agency consultative psychologist Lisa Foulk, Psy.D., reviewed the medical evidence on reconsideration. Tr. 100–116. Dr. Foulk found that Evege hadn't alleged any psychological changes and that the evidence remained consistent with and supportive of Dr. Waggoner's RFC findings. Tr. 103. Dr. Foulk indicated that she too was adopting the mental RFC findings from the prior ALJ's September 2020 decision in compliance with Acquiescence Ruling 98-4 and *Drummond.* Tr. 103, 105.

### 4. Testimonial evidence

Evege and a vocational expert testified during the hearing in January 2022. Tr. 33–65. Attorney David Dick represented Evege. Tr. 33. Dick made an opening statement advocating that ALJ Hartranft find Evege disabled, Tr. 38–39, asked the ALJ to amend Evege's disability onset date to December 9, 2020,[16] Tr. 39–40. Evege then testified. Tr. 41–60.

---

[16]    Dick asked ALJ Hartranft to amend the disability onset date from October 13, 2017 to December 9, 2020. Tr. 39–40. The ALJ thanked him then said, "All right. Let's begin with some background questions." *See* Tr. 41. Dick later referred to "December 9th … 2020" as the date to which "we've" amended the onset of Evege's disability, without any objection. *See* Tr. 56. And, in his decision, ALJ Hartranft acknowledged that during the hearing, Evege amended her alleged onset date on the advice of counsel. *See* Tr. 15.

Throughout his findings, however, ALJ Hartranft listed Evege's original, not amended, alleged disability onset date. For example, at step one, the ALJ found that Evege "ha[d] not engaged in substantial gainful activity since October 13, 2017, the alleged onset date." Tr. 18. In classifying Evege's age, he found that she was "41 years old … on the alleged disability onset date," Tr. 26, but she was 41 in October 2017, *see* Tr. 88. He found that Evege hadn't been "under a disability" from October 13, 2017 "through the date of this decision." *See* Tr. 27. Notably, the state agency consultant's medical opinions also considered the relevant time period here as beginning on October 13, 2017; however, this was because at the time they rendered their opinions rendered,

Evege said that she had recently gained temporary custody of her five-year-old grandson, who lived with her in her one-bedroom apartment with a loft. *See* Tr. 41, 54. Evege could drive without any problems, even though three of the toes on her right foot were "numb [and] tingly all the time." Tr. 42. She worked part-time as a "shifter," which "consist[ed] of grocery shopping for people and delivering" groceries. Tr. 43. Each order was timed and Evege was able to complete as many as five orders in a row. Tr. 44. She worked as frequently as her "body allow[ed]." Tr. 44–45. Evege estimated that she lifted about 20 pounds shopping and delivering these groceries. Tr. 45.

Evege said that she wasn't able to work because her "mind [was] fuzzy … [and] [it was] a little harder to concentrate" after her stroke. Tr. 48. Her back problems also prevented her from working and made her stand "with a little hunch." *Id.* When Evege shopped for groceries, she leaned on the cart. *Id.* She leaned when she washed dishes and cooked, too, because she could not stand up straight to complete those activities. Tr. 49. Evege said that she took her time doing everything unless her grandson needed her. Tr. 48. She denied

---

Evege hadn't yet amended the date. *See, e.g.*, Tr. 88–93, 94–98, 99, 100, 101–07, 115–16, 117–19, 120–24, 125–29.

Evege doesn't raise any issue related to this discrepancy. So she has forfeited any argument based on it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). But even if she hasn't, the ALJ's oversight was harmless error if error at all. Reading the decision as a whole, *see Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016), it's clear, as discussed below, that ALJ Hartranft appropriately evaluated the present application as a distinct and unadjudicated period of time. This resulted in his crafting an updated RFC that differed from the previous RFC and benefitted Evege. *See* Tr. 22, 74.

15

using a cane or other assistive device for ambulation, saying that she "just t[ook] her time." Tr. 49. Evege explained that "[e]verything [was] a little complicated" due to her back pain, which never eased and was "always the same." Tr. 48. Evege had issues with sitting and standing "sometimes[.]" Tr. 48–49. She couldn't sit or lie down for very long. Tr. 49.

Evege testified that she took Gabapentin for her back problems, *see* Tr. 51, and that Verapamil helped with the residual effects of her stroke, Tr. 49. She still got "little headaches" frequently and they could last all day but didn't bother her "too much." Tr. 50. She said she'd been experiencing constant tingling and numbness in her right toes for three years. Tr. 49.

Evege wasn't receiving mental health treatment but she took "a couple pills" for her anxiety and depression. Tr. 52.

Evege discussed her activities of daily living, explaining that prior to gaining custody of her grandson, her typical day had consisted of waking up, making coffee, "get[ting] [herself] together," and showering. Tr. 53–54. Then, if Evege felt she was able, she would look for an available shifter job shopping for and delivering groceries. *Id*. She said that if she were having "a bad day," she wouldn't look for work because she needed to alternate between sitting to standing too frequently to shop and deliver groceries. Tr. 54. Evege said that she had obsessive compulsive disorder and tried to keep her house very clean even though she was "very slow and bouncy" when she cleaned. *Id*. Evege reported that she used to love to walk, hike, and read, but couldn't do those

things anymore. Tr. 54. After her stroke, she wasn't able to read because the words "kind of dance[d]," though she hadn't seen a doctor about this problem. Tr. 54–55. Evege enjoyed making things and considered herself a "crafty" person. Tr. 54.

After Evege, vocational expert Lanell Hall testified. Tr. 59–64. Hall said that that a hypothetical individual with Evege's age and the same level of education, work experience, and limitations assessed in Evege's RFC, described below, would not be able to perform any of Evege's relevant past work. Tr. 61. Such an individual could, however, perform unskilled labor with a sedentary level of exertion such as a document preparer, touchup screener, or table worker. Tr. 61–62. Being off task more than ten percent of the workday or absent more than once a month would preclude all work. Tr. 62.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since October 13, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: lumbar spine degenerative disc disease; status-post left tibia and fibula fracture with surgical fixation; reversible vasoconstrictive syndrome and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except occasional use of foot controls; occasional climbing ramps and stairs; no climbing ladders, ropes or scaffolds; occasional stooping, kneeling, crouching, and crawling and avoid workplace hazards such as unprotected heights and machinery. The claimant is further limited to simple, routine, repetitive tasks involving only simple, work related decisions and with few, if any, workplace changes; no strict production quotas or fast paced work, such as on an assembly line and occasional interaction with the general public, co-workers and supervisors with no customer service responsibilities and no tandem tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in March 1976] and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 13, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18–27.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past

> relevant work? If so, the claimant is not disabled.
> If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering
> the claimant's residual functional capacity, age,
> education, and work experience? If so, the
> claimant is not disabled. If not, the claimant is
> disabled.

20 C.F.R. §§ 404.1520, 404.1520; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d

417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the

national economy that the claimant is capable of performing." *Id.* "The

claimant, however, retains the burden of proving her lack of residual functional

capacity." *Id.* If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it

determines "that the ALJ has failed to apply the correct legal standards or has

made findings of fact unsupported by substantial evidence in the record."

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which

"a court … asks whether" the "existing administrative record … contains

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial

evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere

scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. Whether the ALJ's RFC was supported by substantial evidence*

Evege alleges that ALJ Hartranft failed to identify substantial evidence in support of his physical RFC findings. Doc. 8, at 8–9. She acknowledges that ALJ Hartranft found greater exertional limitations as compared to ALJ Southern, yet claims she is entitled to remand because ALJ Hartranft "failed to identify the evidence or provide rationales for the specific abilities and limitations" he included in his RFC. Doc. 8, at 8. Evege is incorrect.

In *Drummond*, the Sixth Circuit acknowledged that certain previous cases "clearly demonstrate that the principles of *res judicata* can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d at 842. It indicated, however, that if an earlier ALJ makes a finding regarding a claimant's RFC, a later ALJ is bound by that RFC determination "absent changed circumstances." *Drummond*, 126 F.3d at 842; *see also Fish v. Saul*, No. 1:20-cv-143, 2020 WL 5094872, at *3 (W.D. Mich. Aug. 28, 2020) (explaining that under *Drummond*, a later ALJ is bound by a prior ALJ's disability determination "*absent evidence to the contrary*") (emphasis added).

Acquiescence Ruling 98-4(6) reconciled the Social Security Administration's policy as to res judicata on one hand with the Sixth Circuit's ruling in *Drummond*, on the other. *See* Acquiescence Ruling 98-4(6), 1998 WL 274052 at 29773; *Fish*, 2020 WL 5094872, at *3–4. It established that, in the Sixth Circuit, an adjudicator making a disability determination for an unadjudicated period *must adopt* the prior findings in a final decision from the ALJ or Appeals Council *unless there is new and material evidence* relating to such findings or if there has been a change in the law, regulations, or rulings. *See* Acquiescence Ruling 98-4(6), 1998 WL 274052, at 29773 (emphasis added); *Fish*, 2020 WL 5094872, at *3–4.

In *Earley v. Comm'r of Soc. Sec.*, the Sixth Circuit clarified the scope of *Drummond* by acknowledging that "a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." 893 F.3d 929, 933 (6th Cir. 2018). *Earley* declared that "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review. There is nothing in the relevant statutes to the contrary. And res judicata only 'foreclose[s] successive litigation of the very same claim.'" *Id.* at 934. *Earley* entitles a claimant to a "fresh review," *id.* at 934, free from "the presumption that the prior RFC remains the correct RFC for the subsequent claim," *see Nadjl v. Comm'r of Soc. Sec.*, No. 1:21-cv-1578, 2022 WL 2820413, at *9 (N.D. Ohio July 8, 2022), *report and recommendation adopted*, 2022 WL 2818444 (N.D. Ohio July 18, 2022); *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415, at *3 (N.D. Ohio Mar. 29, 2021). An ALJ "errs only when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, No. 1:18-cv-859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019), *report and recommendation adopted*, 2020 WL 871201 (W.D. Mich. Feb. 21, 2020).

Before Evege filed her present application, ALJ Southern denied disability in a decision addressing Evege's abilities and limitations between October 13, 2017, and September 24, 2020. *See* Tr. 83. Evege's present application covers the time period from December 9, 2020 to February 1, 2022. *See* Tr. 27. So Evege's current claim concerns a time period distinct from the

one at issue in her prior claim. And since "each application is entitled to review," *Earley*, 893 F.3d at 933, one relevant question is whether ALJ Hartranft treated the prior ALJ's decision as a mandatory starting point or considered it a factor in his analysis, *see Gale*, 2019 WL 8016516, at *5. Review of ALJ Hartranft's decision and the RFC findings shows that the latter is true.

ALJ Hartranft limited Evege to sedentary work and found additional limitations that were more restrictive than the RFC recommended by any of the medical experts, including Dr. Hughes. *Compare* Tr. 22, *with* 104–05. For example, Dr. Hughes found that Evege could frequently climb ramps or stairs and occasionally climb ladders, ropes, or scaffolds. Tr. 104–05. According to ALJ Hartranft's RFC, however, Evege could only *occasionally* climb ramps or stairs and could *never* climb ladders, ropes, or scaffolds. Tr. 22. Evege can't point to any medical opinion recommending limitations greater than those set forth by the ALJ in his decision. So, even if ALJ Hartranft erred in analyzing the findings of Dr. Hughes as Evege alleges, the error—which benefitted Evege—would be harmless at best. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions than the state agency reviewers opined") (citations omitted); *Berrier v. Comm'r of Soc. Sec.,* No. 3:20-cv-1655, 2021 WL 6881246, at *9 (N.D. Ohio Sept. 10, 2021), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022); *Ferris v.*

*Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

ALJ Hartranft found that Evege retained the ability to perform sedentary work with additional limitations in consideration of her stroke and diagnosis with reversible cerebral vasoconstrictive syndrome, which occurred several months after ALJ Southern issued her RFC findings. *See* Tr. 23–24, 83. ALJ Hartranft found that this evidence was new and material. Tr. 23. He found that it established the existence of a "new severe impairment" which warranted greater limitations than those included in the prior RFC. *See id*. He found that ALJ Southern's September 2020 light work RFC no longer applied. *See id*. But ALJ Hartranft also found that Evege's new severe impairment and greater limitations did not preclude her from all work and thus she was not disabled. Tr. 23–24, 26–27; *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). There is ample evidence in the record to support this conclusion.

For example, ALJ Hartranft noted that Evege's additional evidence contained records establishing a stroke or stroke-like symptoms due to reversible cerebral vasoconstrictive syndrome and updated diagnostic images showing degenerative changes at two levels in her spine. *See* Tr. 24 (citing Tr. 420, 441–42, 485).The ALJ noted, however, that within six months, Evege was reporting significant improvement and these subjective statements were supported by physical examination results. *See* Tr. 24. The ALJ cited Evege's improved headaches as recorded in April 2021 and her assertion of no more

than "mild residual weakness" in her left leg. Tr. 24 (citing 550–51). Evege had full motor strength in her extremities, normal sensation, and mild limp on the left side while walking. *See id*. By September 2021, when Evege was treated for tendonitis in her knee, she had a normal range of motion, coordination, motor strength, and sensation and no evidence of swelling, tenderness, deformity, or signs of injury. Tr. 1115. The ALJ found that

> the record indicate[d] … the claimant's condition improved and essentially reversed with medication. Aside from slight residual weakness of the claimant's left leg, the evidence d[id] not document ongoing symptom reports from the claimant. Moreover, there [wa]s no evidence of significant ongoing treatments or therapies since the claimant's stroke.

Tr. 24. The ALJ thus adequately considered the new and material evidence in finding that Evege was nonetheless capable of sedentary labor. *See* Tr. 24–26.

Further explaining his rationale for finding Evege capable of a reduced range of sedentary work, ALJ Hartranft cited her obtaining custody of her five-year-old grandson and working part-time shopping for and delivering groceries. *See* Tr. 21, 24. The ability to live alone and independently perform the activities of daily life were proper considerations. *See Berry v. Comm'r of Soc. Sec.*, 289 F. App'x 54, 56 (6th Cir. 2008) ("Particularly, Berry's ability to live independently and perform regular household activities belies her claim that she is totally disabled"); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of

26

pain or ailments."). And the fact that ALJ Hartranft cited such recent evidence demonstrated his "fresh review" of the case. *See Earley*, 893 F.3d at 934.

And, as the Commissioner points out, Doc. 11, at 7, the ALJ further showed that he was providing the case "fresh review" as he evaluated the medical opinions of state agency consultative physicians Doctors Bolz and Hughes, *see* Tr. 25. In finding unpersuasive Dr. Bolz's opinions, which were a whole-cloth adoption of ALJ Southern's physical RFC findings, ALJ Hartranft noted that Dr. Bolz had not properly credited Evege's "new and material evidence" of her stroke or stroke-like symptoms and reversible cerebral vasoconstrictive syndrome. Tr. 25, *see also* Tr. 74, 91–92, 442, 485. In contrast, the ALJ found persuasive Dr. Hughes's opinions, noting that they recommended deviating from the prior RFC findings due to Evege's additional evidence. *See* Tr. 25 (citing Tr. 105). ALJ Hartranft adopted Dr. Hughes's opined maximum sedentary level of exertion and showed that he understood the import of Evege's additional evidence by incorporating additional postural and environmental limitations into the RFC.[17] *See* Tr. 25, 106. He cited Evege's radicular leg pain, foot numbness, and weakness as the basis for his "occasional postural limitations, including operation of foot controls." Tr. 25. He said that

---

[17]    The Commissioner says that Dr. Hughes found Evege was capable of light work. *See* Doc. 11, at 7. Dr. Hughes, however, explicitly stated in his opinion that "[b]ased on the seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling), [Evege] demonstrate[d] a maximum sustained work capability of the following [level]: **Sedentary**." Tr. 106 (bold in original).

he accounted for Evege's "overall condition and potential for deconditioning and weakness" by eliminating her exposure to workplace hazards and prohibiting her from climbing ladders, ropes, or scaffolds. *Id*. ALJ Hartranft thus set forth RFC findings containing greater restrictions as compared to ALJ Southern's RFC findings as well as the recommendations of either of the state agency consultative physicians. *Compare* Tr. 22, *with* Tr. 74, 91–92, 104–06. In so doing, he showed how he accounted for Evege's additional evidence and demonstrated the extent to which he provided a fresh review to her present application.

Evege says that "no medical professional has reviewed and provided an opinion since the amended alleged onset date of December 9, 2020," Doc. 8, at 17, but, as illustrated above, that's simply not the case. Dr. Hughes reviewed the full record in May 2021 and provided medical opinions, which took account of Evege's treatment to that date. *See* Tr. 101, 104–06. And Evege provides nothing to establish how the ALJ's disability determination might have been enhanced by having an additional medical expert's review of the additional evidence. *See Owens v. Berryhill*, No. 1:18-cv-1043, 2019 WL 2465229, at *8 (N.D. Ohio Feb. 13, 2019) ("Owens has offered no information concerning what evidence further record development could offer that would have enhanced a determination of disability"), *report and recommendation adopted*, 2019 WL 1929695 (N.D. Ohio Apr. 30, 2019). Evege doesn't explain whether and what additional evidence would have made the ALJ's disability determination

"proper." *See* Doc. 8, at 16–17; *see also Landsaw*, 803 F.2d at 214 (quoting *Turner*, 563 F.2d at 671). She thus fails to meet her burden.

Evege cites *Falkosky v. Commissioner of Social Security*, in which another court held that because additional consultative opinion evidence was necessary, an ALJ's RFC was not supported by the record. Doc. 8, at 16; *Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-cv-2632, 2020 WL 5423967, at *8 (N.D. Ohio Sept. 10, 2020)). Unlike in *Falkosky*, however, ALJ Hartranft had ample evidence—based on examinations, reports, diagnostic tests, and treatment Evege received on or after December 9, 2020—to reach a decision. *See, e.g.*, Tr. 419–551, 787–837, 863–1152. And he cited this evidence in support of his findings. *See, e.g*, Tr. 21, 24–25. So on its own terms, *Falkosky* doesn't support Evege's argument.

Moreover, *Falkosky* expressly followed the "*Deskin* 'rule.'" 2020 WL 5423967, at *6. As is discussed in issue two, *Deskin* is inconsistent with Sixth Circuit precedent. Moreover, *Deskin* and its progeny only *potentially* apply in two narrow circumstances. *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), *2 (emphasis added); *see Phelps v. Comm'r of Soc. Sec. Admin.*, No. 1:21-cv-2295, 2022 WL 18395824, at *9 (N.D. Ohio Nov. 15, 2022), *report and recommendation adopted*, 2023 WL 316016 (N.D. Ohio Jan. 18, 2023). *Deskin* could only possibly apply here if Evege were able to establish that ALJ Hartranft developed his RFC based on an "outdated" medical source opinion "that [did] not include consideration of a critical body

29

of objective medical evidence." *See Kizys*, 2011 WL 5024866 at *2. Evege hasn't shown that this occurred. In fact, the ALJ acknowledged Evege's additional evidence—records of a stroke or stroke-like symptoms from reversible cerebral vasoconstrictive syndrome—and found it material. *See* Tr. 23 ("The record contains evidence of a new severe impairment.") He then incorporated it into the RFC. *See* Tr. 22, 25.

What's more, Dr. Hughes explicitly accounted for Evege's additional evidence in his opinion and his findings were—again—less restrictive than those set forth by ALJ Hartranft in the RFC. *See* Tr. 22, 104–05. Dr. Hughes cited Evege's additional evidence as his basis for deviating from the prior ALJ's decision and finding Evege capable of sustaining no greater than a sedentary level of exertion. *See* Tr. 101, 106. And where "there is not a 'critical body' of the 'objective medical evidence' that is not accounted for by a medical opinion[,] … the narrow *Deskin* rule does not apply." *Monet v. Comm'r of Soc. Sec.*, No. 20-12484, 2022 WL 298130, at *5 (E.D. Mich. Jan. 13, 2022), *report and recommendation adopted*, No. CV 20-12484, 2022 WL 298567 (E.D. Mich. Jan. 31, 2022). Evege can't show that her additional evidence was overlooked by the medical opinions, so even if *Deskin* were good law, it wouldn't apply. *Monet*, 2022 WL 298130, at *5.

After challenging the physical RFC findings, Evege addresses her objections to the mental RFC findings, which she claims are not supported by substantial evidence. Doc. 8, at 9, 12, 16; Doc. 12, at 3–4. Evege says that "much

of [ALJ Hartranft's] RFC finding is virtually the same as the prior RFC finding," but claims that ALJ Hartranft "excluded greater mental limitations without explanation." Doc. 8, at 8. She objects to his rephrasing of language from the prior RFC, specifically, his removal of the word "superficial" from ALJ Southern's social interaction limitations. *See* Doc. 8, at 8. Evege says that the omission of the word superficial represents an increase in mental functioning and shows that ALJ Hartranft found "improvement in comparison to the prior RFC," which was improper there was "no new evidence addressing [her] mental functioning." Doc. 8, at 10.

ALJ Southern previously limited Evege to "occasional but superficial interaction with coworkers, supervisors, and the public, superficial being that which is beyond the performance of job duties and job functions, for a specific purpose, and a short duration." Tr. 74. In the present application, ALJ Hartranft limited her to "simple, routine, repetitive tasks involving only simple, work related decisions and with few, if any, workplace changes; ... and occasional interaction with the general public, co-workers and supervisors with no customer service responsibilities and no tandem tasks." Tr. 22. ALJ Hartranft explained that his mental limitations were "essentially an adoption of the prior ALJ's limitations," which he "rephrased for clarity." Tr. 24–25. He found that the record did not contain "evidence of abnormal clinical or diagnostic findings sufficient to document any further degree of loss of function." Tr. 25

Evege essentially says, without legal or factual support, that because ALJ Hartranft found that new and material evidence—documenting Evege's stroke and diagnosis of reversible cerebral vasoconstrictive syndrome—existed, which warranted departure from ALJ Southern's physical RFC findings, he "should not have adopted" ALJ Southern's findings as to Evege's mental RFC. *See* Doc. 8, at 11. Somewhat contradictorily, Evege then says that ALJ Hartranft did not actually adopt ALJ Southern's findings and erred by failing to provide a sufficient explanation of how his rephrased findings were supported by and consistent with the record. *Id*. Evege then appears to argue that ALJ Hartranft should have adopted ALJ Southern's mental RFC findings, saying that "it is unclear whether the occupations identified by the current vocational expert could be performed" if ALJ Hartranft had adopted the prior mental RFC. *See* Doc. 8, at 14. In addition to being unclear, this argument is unsupported.

As an initial matter, Evege does not dispute the ALJ's finding that she did not have any new and material evidence of a change in her mental functioning since ALJ Southern issued the previous RFC findings in September 2020. *See* Tr. 25. Evege thus forfeited the argument that ALJ Hartranft erred when he incorporated into his RFC the state agency consultative psychologists' opinions, which the ALJ found persuasive and which were adoptions of the September 2020 mental RFC findings. Tr. 22, 74.

Turning to whether the ALJ properly rephrased the social interaction limitations, Evege seems to argue that ALJ Hartranft erred by omitting a limitation to no more than occasional and "superficial" interaction. Doc. 8, at 13–14. But ALJ Hartranft removed a superficial interaction limitation, which could be considered vague, and rephrased it as a more specific no-tandem-tasks limitation. Tr. 22, 74. He explained that he had rephrased the prior ALJ's language for clarity. Tr. 24–25. And, moreover, ALJ Hartranft did not remove any limitation, he merely adjusted the language of Evege's social interaction limitation to more vocationally relevant language that clarified its scope. *See* Tr. 22. In this way, ALJ Hartranft did not err in rephrasing ALJ Southern's RFC findings. *See Kearns v. Comm'r of Soc. Sec.*, No. 3:19-cv-1243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020) ("[T]he ALJ's limitation to no team or tandem tasks is a qualitative limitation on social interaction and adequately addressed the opinion of Drs. Matyi and Finnerty that Kearns be limited to superficial interaction with others."), *report and recommendation adopted*, No. 3:19-cv-1243, 2020 WL 2839654 (N.D. Ohio June 1, 2020); *Romo v. Comm'r of Soc. Sec.*, 3:20-cv-1557, 2021 WL 5040385, at *7 (N.D. Ohio July 9, 2021) ("The Court agrees that the ALJ included Dr. Tishler's and Dr. Delcour's superficial interaction limitation in the RFC by including a limitation to 'no tandem work."), *report and recommendation adopted*, 3:20-cv-1557, 2021 WL 4437062 (N.D. Ohio Sept. 28, 2021).

Evege also claims that ALJ Hartranft's mental RFC was "unexplained and unsupported by substantial evidence" and that ALJ HArtranft "excluded potentially debilitating limitations when considered in conjunction with Plaintiff's other limitations." Doc. 8, at 9, 13. But she doesn't say what those alleged debilitating limitations are.

And when ALJ Hartranft's decision is considered as a whole, *see Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016), it shows that substantial evidence did adequately support his mental RFC findings. He specifically addressed each of the four broad areas of mental functioning,[18] finding Evege no more than mildly limited in the ability to understand, remember, or apply information and the ability to adapt or manage herself, and no more than moderately limited in the ability to interact socially and the ability to concentrate, persist, or maintain pace. Tr. 21.

To support these findings, ALJ Hartranft cited Evege's lack of mental health treatment, though he acknowledged that she took medication for depression and anxiety. *Id*. He noted that she attended high school through the 12th grade. *Id*. The ALJ recited Evege's reported difficulty sleeping, biting

---

[18]    The Social Security Administration divides the mental functioning necessary in a work setting into four broad areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A1. When the Commissioner evaluates a claimant's mental functioning, he considers these four broad areas as well as the claimant's ability to function independently, appropriately, effectively, and on a sustained basis. *Id*.

her nails, and slower thought processing since having the stroke. *Id*. The ALJ also noted that Evege was able to gain temporary custody of her five-year-old grandson. *Id*. He observed that although Evege reported that her mind was fuzzy and it was more difficult for her to concentrate, she was able to pay bills, count change, handle a savings account, and use a checkbook. *Id*. ALJ Hartranft noted Evege's self-reported ability to follow written and spoken instructions "ok." *Id*. He cited Evege's statements that stress induced her anxiety and headaches, and that she adjusted slowly to changes in routine. *Id* (citing Tr. 255–62). ALJ Hartranft noted that, at times, treatment providers found Evege anxious and uncooperative. *Id* (citing Tr. 351).

ALJ Hartranft found, however, that throughout the record, Evege "typically present[ed] with [a] normal mood and affect, behavior, cognition and memory." Tr. 22 (citing Tr. 863–1156 (hospital records for treatment received between April and September 2021)). He discussed the fact that there was no evidence showing emergency medical treatment for "acute mental symptom exacerbations" and no documented history of "hospitalizations for periods of mental instability." *Id*. The ALJ observed that Evege was "able to relate and respond appropriately to treatment and other sources throughout the record without notable difficulty." *Id*.

In addition, ALJ Hartranft incorporated the medical opinions of the state agency consultative psychologists, which he found persuasive, in crafting the mental RFC. Tr. 22. Evege claims that ALJ Hartranft failed to properly

assess or explain the supportability and consistency factors when he evaluated the persuasiveness of these opinions. Doc. 8, at 11. But Evege ignores the plain language of the ALJ's decision. For example, ALJ Hartranft explained that the consultant psychologists' medical opinions were "consistent with the evidence as a whole, which reflects the relative stability of the claimant's mental health condition without evidence of new or material changes." *Id*. He explicitly addressed the factors of supportability and consistency, which means that he met the adequacy requirements for finding a medical opinion persuasive. *See* 20 C.F.R. § 416.920c(b)(2) (the Commissioner must explain the factors of supportability and consistency when discussing the persuasiveness of a medical opinion); *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) ("[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis")(citing cases); *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) ("A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion.") (internal quotation marks and citation omitted). And, as illustrated, elsewhere in his decision, ALJ Hartranft cited ample evidence to support his assertions of the supportability and consistency of the state agency consultant's mental RFC findings.

ALJ Hartranft reviewed the record and found that Evege had "new and material" evidence, which warranted greater limitations in Evege's RFC. *See*

Tr. 23–24. He then crafted an RFC aligned with these findings and in accord with relevant agency regulations, principles of res judicata, and Sixth Circuit precedent. *See* Tr. 22. He adequately explained his rationale in finding that even though Evege's new and material evidence warranted a more restrictive RFC, the resulting RFC still permitted Evege to perform an unskilled, sedentary range of work that was available in significant numbers in the national economy. *See* Tr. 23–24, 26. ALJ Hartranft thus appropriately found that Evege was not disabled. *See* Tr. 27.

Evege hasn't met her burden to show otherwise. She asserts that there is substantial evidence to support a work-preclusive RFC. *See* Doc. 8, at 10–14; Doc. 12, at 2. Whether, however, such evidence might be found is irrelevant because Evege hasn't shown that the ALJ's finding—that she was capable of a sedentary level of exertion with additional limitations—was *not* supported by substantial evidence. Evege hasn't shown any flaw in the ALJ's logic or demonstrated that his conclusions were based on less than substantial evidence. And she cannot establish error simply due to the fact that she believes that there was evidence in the record which might have supported a different conclusion. Evege's argument ignores the standard of review and invites the Court to reweigh the evidence, which it cannot do. *See Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020). A disagreement with the ALJ's RFC findings does not "provide a basis for remand." *Steed v.*

*Colvin*, No. 4:15-cv-1269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016). And so, this argument fails.

>    2. *Whether the ALJ had a duty to further develop the record in light of Evege's "new and material" evidence*

While an ALJ must ensure that every claimant receives a "full and fair hearing," the ultimate burden of proving entitlement to benefits lies with the claimant. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); 20 C.F.R. § 404.1512(a)). Although social security proceedings are inquisitorial rather than adversarial, that doesn't mean that the ALJ advocates for the claimant. *See Moats*, 42 F.4th at 563 ("Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate.") (citing *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality opinion).

As discussed above, ALJ Hartranft's RFC findings departed from those of the prior ALJ in that ALJ Hartranft found greater functional limitations in February 2022, than ALJ Southern found in September 2020. *Compare* Tr. 22 *with* 74. Specifically, ALJ Southern found that Evege had the RFC to perform light work with additional limitations. Tr. 74. ALJ Hartranft found that Evege had the RFC to perform sedentary work with additional limitations. Tr. 22. ALJ Southern found Evege capable of no more than frequent use of foot controls with her left lower leg, while ALJ Hartranft found her capable of no more than occasional use of foot controls, generally. *See* Tr. 22, 74. Both ALJs

found that Evege could only occasionally climb ramps or stairs; occasionally stoop, kneel, crouch, or crawl; never climb ladders, ropes, or scaffolds; and must avoid workplace hazards such as unprotected heights and machinery. Tr. 22, 74. Both ALJs limited Evege to simple, routine tasks without a fast pace and without strict production quotas. Tr. 22, 74. ALJ Southern found that Evege could handle no more than occasional, superficial interaction with coworkers, supervisors, and the public. Tr. 22. ALJ Hartranft found that Evege could handle no more than occasional interaction with coworkers, supervisors, and the public, and he additionally restricted Evege from being assigned customer service responsibilities or tandem tasks. Tr. 74. ALJ Hartranft thus found greater functional limitations and more restrictions than ALJ Southern. And, as illustrated in the discussion of Evege's first issue, ALJ Hartranft's RFC was also more restrictive than the medical experts' opined limitations. *Compare* Tr. 22, with 88–92, 94–98, 101–07, 108–114. Evege argues, nonetheless, that ALJ Hartranft failed in his duty to develop the record when he did not seek out additional medical opinion evidence to support his departure from ALJ Southern's RFC findings. Doc. 8, at 1. This argument fails for several reasons.

First, Evege is in no position to assert as error, something that benefitted her. And ALJ Hartranft's departure from ALJ Southern's *less restrictive* RFC findings benefitted Evege.

Second, contrary to Evege's assertion, Doc. 8, at 8–9, an ALJ can formulate an RFC without a medical opinion. *See Mokbel-Aljahmi v. Comm'r*

*of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion").

A third hurdle for Evege is that the rule on which her duty-to-develop-the-record argument relies does not enjoy the support of binding legal precedent. Evege relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008) and its progeny. Doc. 8, at 16–17. In *Deskin*, the court held that:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). The *Deskin* court clarified its decision in *Kizys*, 2011 WL 5024866, at *2, to hold "that *Deskin potentially* applies in only two circumstances: when an ALJ made an RFC determination based on no medical source opinion, or when an ALJ made an RFC based on an 'outdated' medical source opinion 'that [did] not include consideration of a critical body of objective medical evidence.'" *Phelps*, 2022 WL 18395824, at *9 (emphasis

added); *see also Berrier*, 2021 WL 6881246, at *6. The court clarified that "*Deskin* sets out a narrow rule that does not constitute a bright-line test." *Kizys*, 2011 WL 5024866, at *2. But *Deskin* isn't controlling, and it has received mixed reviews. *See Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) ("*Deskin* … conflicts with the regulations and Sixth Circuit case law"); *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."); *see also Berrier*, 2021 WL 6881246, at *6 (citing cases that followed *Deskin* and those that did not).

The bottom line is that courts apply different standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove her case rests on the claimant, not the ALJ. *See Moats*, 42 F.4th at 563; 20 C.F.R. § 404.1512(a). Further, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant her the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917(a)); *see Winans*, 2023 WL 7622634, at *3–4 nn. 39–40, 42–43, 50 (citing *Landsaw*). While the ALJ has a duty to conduct a "full inquiry," that duty "does not require a consultative examination

41

at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see also* 20 C.F.R. § 416.919a(b)(1) (providing that an ALJ may be required to obtain a consultative exam when "[t]he additional evidence needed is not contained in the records of [the claimant's] medical sources").

Fourth, it is only under "extreme circumstances"—not present here— that the ALJ could be said to have a "special duty" to help develop the record. *See Moats*, 42 F.4th at 563–64 (discussing *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)). In *Lashley*, the ALJ failed to meet this special duty where the claimant wasn't represented by counsel and only had a fifth-grade education. 708 F.2d at 150–52. A series of strokes left Lashley unable to articulate his thoughts and impaired his ability to read. *Id.* Here, in contrast, Evege was represented by counsel and there is no indication that Evege had difficulty testifying. Tr. 39–59. So Evege hasn't shown that hers was an "extreme" situation in which the ALJ had a heightened duty to develop the record in her case. *See Moats*, 42 F.4th at 564 (distinguishing *Lashley* and declining to impose a duty-to-develop-the record-obligation even though the claimant was unrepresented). Evege says that "[i]t is unclear why consultative examinations were not obtained in this matter."

Doc. 8, at 17. But one possible reason for this alleged omission is that her counsel, who made other requests of the ALJ,[19] didn't ask for it.

In sum, ALJ Hartranft provided adequate support for his "[o]verall" finding that "the evidence [did] not support more than mild to moderate functional limitation as a result of the claimant's mental health impairment nor [was] there evidence of new and material changes regarding the claimant's mental health since the prior ALJ['s] decision." *Id*. Evege hasn't shown that his findings were *not* supported by such evidence. So this argument fails.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: February 6, 2024

 */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).

---

[19]    For example, counsel asked the ALJ to amend the disability onset date and said that although Evege worked as a "shifter," he didn't "want to say [that] she's working." *See* Tr. 37, 39–40.